Filed 2/2/16  P. v. Mendiburu CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068479 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SICRF110052197) |
| JOSEPH CHARLES MENDIBURU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Inyo County, Brian J. Lamb and Randall D. White, Judges.  Affirmed in part and reversed in part.

Law Offices of Mark Pachowicz and Mark R. Pachowicz for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Joseph Mendiburu of grand theft of personal property with an aggregate value in excess of $950 (Pen. Code § 487, subd. (a),[1] count 1), felony theft of cattle (former § 487, subd. (d)(1), count 3), felony theft of a truck (§ 487, subd. (d)(1), count 4), and perjury (§ 118, count 5). Mendiburu was sentenced to a total term of 52 months in custody.[2]

On appeal, Mendiburu asserts his convictions on counts 1 and 3 must be reversed because California's jurisdictional authority over those counts was an issue that should have been submitted to and decided by the jury, and alternatively asserts the jurisdictional determination was unsupported by substantial evidence. He also asserts all of the convictions must be reversed because (1) three exhibits were erroneously admitted at trial, (2) evidence of "prior bad acts" was erroneously admitted at trial, and (3) there were numerous instructions required sua sponte to be given but omitted. He also asserts we must reverse the order denying his new trial motion because it was not heard by the same judge who presided over his trial, and because the judge who heard the motion applied the incorrect standards. He also asserts there were errors during the sentencing phase of the trial.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     The court selected the conviction on count 5 as the principle term and imposed the midterm of 36 months on that conviction. The court imposed subordinate terms of eight months each for the convictions on counts 3 and 4, and ordered those to run consecutive to the term imposed on count 5. The court also imposed a subordinate term of eight months for the conviction on count 1, but stayed that sentence pursuant to section 654.

# I

## FACTS

A. <u>The Relationships</u>

Mendiburu's father, George, died intestate and unmarried in December 2008. George's three children, Mendiburu and his sisters Danielle and Nicole, initially were the administrators of George's estate and were responsible for administering the estate's assets, which included Flying M Cattle Company, a corporation (FMC) which owned and operated the Flying M Cattle Ranch (the Ranch) located in California.

In February 2009 the three siblings as administrators became the officers and directors for FMC. However, in October 2009 Mendiburu resigned as an administrator of George's estate and also "stepped down" from his role as a board member and officer for FMC. Thereafter, only the two sisters were administrators of the estate and board members and officers of FMC. At that time, the sisters decided to hire Mendiburu as manager for the Ranch, because he was familiar with its operations and they did not live near the Ranch. They also established a new bank account for FMC that only the two sisters could access, and Mendiburu was not permitted to handle or access any of FMC's finances or to obtain access to the bank account. Mendiburu was not authorized to sell any of the cattle from the Ranch without prior approval of the sisters, and was instructed that any monies he happened to come into possession of during his management of the Ranch was to be sent promptly to a Bakersfield, California mailing address accessible by the sisters. In short, Mendiburu was not permitted to "have anything to do with the money anymore."

3

B. <u>Counts 1 and 3 (Grand Theft and Grand Theft-Cattle)</u>

The prosecution's theory was that, in November 2009, Mendiburu stole assets of the Ranch by taking cattle from the Ranch in California and selling them without permission in Nevada, and ultimately keeping the funds from the sale, which he lost at a casino in Nevada.

Before cattle may be transported from a ranch and sold at auction, they must be inspected by a brand inspector and the inspector must issue an inspection certificate authorizing the transfer. In November 2009, Mendiburu contacted a brand inspector to come to the Ranch to conduct the inspection required to transfer and sell the cattle. The inspector inspected 83 head of cattle belonging to the Ranch, as well as another 8 head belonging to Mendiburu, and issued the certificate authorizing the transfer of the cattle to an auction house in Nevada for sale. The Nevada auction house received the cattle, listing Mendiburu as consignor, and sold consigned Ranch cattle on November 18, 2009. The Nevada auction house issued a check, payable to Flying M Ranch, for $34,221.44, representing the net proceeds for the sale of the Ranch's cattle.[3] However, the auction house mistakenly sent that check to another ranch (also named "Flying M.") with which the auction house also did business. A few weeks after the sale, that mistake was discovered and Mendiburu went to the Nevada auction house, at which time the Nevada auction house handed Mendiburu a new check (again made out to the Flying M Ranch) for $34,221.44.

---

[3]    The auction house also sent a check to Mendiburu for the net proceeds from the sale of his cattle.

4

Mendiburu then tried to cash the check at a Nevada bank, which was unable to cash the check because it was made out to a business. However, the bank was able to convert the check into cashier's checks (which are as good as cash) made payable to the Ranch but specifying Mendiburu as "remitter." That same day, Mendiburu took those cashier's checks to a casino in Nevada, cashed them at the Nevada casino, and ultimately gambled away the proceeds.

Mendiburu was required to obtain his sisters' permission to sell Ranch's cattle, but did not obtain their permission (or even tell them) of the November sale or that he obtained the funds from that sale. By March 2010, the sisters had hired a private investigator because of their concern over Mendiburu's activities at the Ranch, and it was after they hired the investigator that they learned of the November sale and what Mendiburu did with the proceeds. In May 2010, the sisters met with Mendiburu and confronted him with the evidence obtained by the private investigator concerning the cattle sale and disposition of the proceeds. After he admitted he had taken the money but adopted a cavalier attitude, the sisters fired him as manager.

C. Counts 4 and 5 (Theft of Truck and Fraud)

At the time of Father's death in 2008, he owned a Toyota truck. In May 2009, when Mendiburu was still one of the co-administrators of his estate, he went to the California Department of Motor Vehicles (DMV) and completed a form titled "Affidavit for Transfer without Probate." In that document, he averred under penalty of perjury that he was the "sole person" who succeeded to Father's property and, based on that affidavit,

he obtained title to the Toyota in his own name.  None of the individual administrators of the estate were authorized to take any item from the estate as their personal property.

## II

## THE ALLEGED JURISDICTIONAL ERRORS

Mendiburu argues his convictions on counts 1 and 3 must be reversed because California's jurisdictional authority over those counts was an issue that should have been submitted to and decided by the jury.  He argues the court erred in not sua sponte instructing the jury that it had to determine, beyond a reasonable doubt, the geographical location at which Mendiburu formed the specific intent to steal the cattle and the proceeds from the cattle sale to invest the California court with jurisdiction over the offenses charged against him.  He alternatively argues that, even if jurisdictional elements are not a jury question, the court erred when it did not determine the issue in connection with his motion to dismiss.

A. Applicable Principles

California's statutory law governing territorial jurisdiction in criminal cases, found in sections 27 and 778, provides in relevant part that "persons are liable to punishment under the laws of this state: [¶] . . . who commit, in whole or in part, any crime within this state" (§ 27, subd. (a)(1)), and also specifies that "[w]henever a person, with intent to commit a crime, does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state, the person is punishable for that crime in this state in the same manner as if the crime had been committed entirely within this state" (§ 778a, subd. (a)).  Our Supreme Court has

6

explained that, under the provisions of section 778a, subdivision (a), "California has territorial jurisdiction over an offense if the defendant, with the requisite intent, does a preparatory act in California that is more than a de minimis act toward the eventual completion of the offense." (*People v. Betts* (2005) 34 Cal.4th 1039, 1047 (*Betts*).)

B. Proceedings at Trial

Prior to trial, Mendiburu moved to set aside the information under section 995, arguing the evidence adduced at the preliminary hearing did not support the exercise of territorial jurisdiction over counts 1 and 3 because there was no evidence that Mendiburu committed any acts in California in preparation for the alleged thefts of the cattle and the proceeds of the sale. The prosecution opposed the motion, noting that on a motion to set aside an information, " 'the question of guilt or innocence of the defendant is not before the court, nor does the issue concern the quantum of evidence necessary to sustain a judgment of conviction. The court is only to determine whether the magistrate, acting as a man of ordinary caution or prudence, could conscientiously entertain a reasonable suspicion that a public offense has been committed in which the defendant had participated.' " (*People v. Ross* (1972) 25 Cal.App.3d 190, 195.) As long as there is some evidence to support the information (including drawing every reasonable inference from the evidence in favor of the information), the court should deny a section 995 motion. (*People v. Velasquez* (1975) 53 Cal.App.3d 547, 553.) The People argued the evidence—that Mendiburu moved cattle from the Ranch and then converted the proceeds from the sale to his personal use without authority to do so—was adequate to provide a reasonable suspicion that his preparatory acts in California (more than de minimis acts)

7

were part of his planned theft, and therefore California could exercise territorial jurisdiction over the charged offenses. The trial court denied Mendiburu's motion to set aside the information "[f]or the reasons set forth in the People's . . . [o]pposition."

C. The Jurisdictional Issue Is Not a Jury Question

Mendiburu argues that, under a series of pre-*Betts* cases,[4] it was error not to submit the issue of jurisdiction to the jury for its determination of whether or not the charged crimes were committed, in whole or in part, within California. He notes the *Betts* court recognized that "[n]one of [the jurisdictional] statutes . . . addresses the question of whether the issue of territorial jurisdiction in a criminal proceeding should be determined by the trial court or by a jury. Section 27, like sections 777b through 778b, is silent on this matter. Nor has our court ever directly addressed the question. In a number of cases, we have discussed issues related to territorial jurisdiction in the context of a jury trial and assumed that the issue properly could be presented to the jury, but those decisions have not directly confronted the question whether a jury trial is required." (*Betts, supra*, 34 Cal.4th 1047-1048.) However, the specific argument was then resolved in *Betts*, when it determined that, although the "courts of other states are divided on the question whether the determination of territorial jurisdiction in a criminal case is for the jury or the trial court" (*id*. at p. 1051), some jurisdictions "have concluded that the court, not the jury, decides whether territorial jurisdiction has been established in a criminal

---

[4]     Mendiburu cites *People v. Anderson* (1961) 55 Cal.2d 655, *People v. Chapman* (1977) 72 Cal.App.3d 6, and *People v. Marvin* (1941) 48 Cal.App.2d 180, to support his claim that he was entitled to have the jury decide the issue of jurisdiction.

8

case" (*ibid*.), and California would adopt that approach because territorial jurisdiction, although involving questions of fact, "is a procedural issue that does not determine the guilt or innocence of the accused. Therefore, the reasoning we applied in [*People v. Posey* (2004) 32 Cal.4th 193] suggests that the trial court, rather than a jury, should decide the issue of territorial jurisdiction." (*Betts,* at p. 1049.) Moreover, the *Betts* court explained, "[b]ecause territorial jurisdiction is a procedural matter that relates to the authority of California courts to adjudicate the case and not to the guilt of the accused or the limit of authorized punishment, a jury trial on the factual questions that establish jurisdiction is not required by the federal Constitution" (*id*. at p. 1054), the defendant is not entitled to a jury determination of territorial jurisdiction under the California Constitution. (*Id*. at p. 1054, fn. 10.)

After *Betts*, the predicate question of territorial jurisdiction is for the trial court rather than the jury. We reject Mendiburu's claim that he was entitled to a jury trial on whether California had jurisdiction to prosecute him for the charged offenses.

D. Substantial Evidence Supported the Jurisdictional Determination[5]

Mendiburu alternatively argues there was no evidence to support the trial court's determination that California could exercise jurisdiction over the charges contained in

---

[5] Mendiburu peremptorily suggests the court never determined the issue of jurisdiction. However, the entire focus of Mendiburu's section 995 motion, and the People's opposition to that motion, was whether there was adequate evidence to show California had a proper basis for exercising jurisdiction over counts 1 and 3. Because the trial court's denial of Mendiburu's motion challenging the exercise of jurisdiction resolved the issues adversely to Mendiburu's claims, the trial court impliedly found a preponderance of the evidence supported the exercise of jurisdiction.

counts 1 and 3 because there was no evidence from which the trial court could have found he possessed the requisite criminal intent when he arranged to ship the cattle from California in November.

Because California has territorial jurisdiction if the defendant, "with the requisite intent, does a preparatory act in California that is more than a de minimis act toward the eventual completion of the offense" (*Betts, supra*, 34 Cal.4th at p. 1047), and Mendiburu does not dispute the evidence of his *actions* in California (of arranging for the cattle to be shipped out of state) amply satisfies the actus reas for territorial jurisdiction of a "de minimis act toward the eventual completion of the offense" (*ibid*.), his challenge to territorial jurisdiction rests solely on his claim there was no substantial evidence of his mens rea at the time of the shipment.  However, the courts have long recognized that the issue of an actor's specific intent may, "and usually must be, inferred from circumstantial evidence."  (*People v. Cole* (1985) 165 Cal.App.3d 41, 48.)  In the analogous context of whether the evidence was sufficient to support a conviction for an offense requiring specific intent, the *Cole* court explained that " '[w]hen a specific intent is an element of the offense it presents a question of fact which must be proved like any other fact in the case.  It is none the less a question of fact though it cannot be proved by direct and positive evidence.  All the circumstances surrounding the act furnish the evidence from which the presence or absence of the specific intent may be inferred by the jury . . . .' [Quoting *People v. Maciel* (1925) 71 Cal.App. 213, 218-219.]  [¶] . . . . [¶] . . . '[E]ven though the appellate court may itself believe that the circumstantial evidence might be reasonably reconciled with the defendant's innocence, this alone does not warrant

10

interference with the determination of the trier of fact. [Citations.] Whether the evidence presented at trial is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Quoting *People v. Towler* (1982) 31 Cal.3d 105, 118.]" (*Cole,* at pp. 48-49.)

That same approach is applied to trial court determinations of territorial jurisdiction. In *Betts*, the defendant contended the evidence was insufficient to support the trial court's conclusion that California had territorial jurisdiction over the offenses occurring outside of California because there was no evidence he intended to molest the victims when he drove them away from California into other states. (*Betts, supra*, 34 Cal.4th at p. 1055.) *Betts*, after reiterating that a defendant may be prosecuted in a California court if the defendant, with the intent to commit a crime, did any act within this state in execution or part execution of that intent, stated that the "prosecution has the burden of proving the facts necessary to establish territorial jurisdiction by a preponderance of the evidence." (*Ibid.*) *Betts* then discussed why the defendant's claim there as to the insufficiency of the evidence to support territorial jurisdiction was unpersuasive, noting an appellate court must uphold a trial court's determination on factual issues if supported by substantial evidence, and then explaining why the circumstantial evidence and inferences therefrom supported the determination he possessed the requisite intent when he performed the acts in California. (*Id*. at pp. 1055-1056.)

11

Here, there was evidence to support the inference that Mendiburu possessed the requisite intent at the time he arranged to transport the cattle.6 First, he knew he had no authority to sell cattle without prior approval of the sisters, but he nevertheless arranged for an inspection in and shipment from California while keeping his actions secret from the sisters. Moreover, any proceeds from cattle sales were supposed to be deposited into a bank account established in October 2009 for the Ranch, over which Mendiburu had no control or authority, but the sales proceeds were not directed to that account, and there was no evidence Mendiburu directed the auction house to send the funds to that account. Finally, there was some evidence Mendiburu had previously misappropriated Ranch assets, which supported an inference that he did not form the intent to again misappropriate funds only after crossing into Nevada. (*Betts, supra*, 34 Cal.4th at pp. 1055-1056 ["Defendant's past acts of child molestation also support the inference that

---

6 Mendiburu's contrary argument rests on his claim that, because there was circumstantial evidence supporting a conclusion he formed the requisite intent only after he picked up the check in Nevada, and a jury is instructed that when two or more reasonable conclusions can be drawn from circumstantial evidence regarding a defendant's intent the jury must adopt the inference of an innocent intent, the inference must be drawn that he lacked the requisite intent until after he entered Nevada. This argument misconstrues the standard of appellate review. "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court [that] must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 932-933.)

12

the idea of molesting Nichole did not first come to his mind after they had left the state."].)

## III

## THE ALLEGED EVIDENTIARY ERRORS

Mendiburu contends the trial court erroneously admitted certain exhibits at trial, and permitted evidence of Mendiburu's prior bad acts, and these errors were prejudicial. We examine each claim of error pertaining to the specific exhibits and testimony admitted at trial.

A. Exhibit 24A

The prosecution sought to admit into evidence a document, entitled "Acknowledgement And Agreement By Heirs To Acts, Accounting, And Other Matters Relating To The Administration Of The Estate Of George L Mendiburu" (the Agreement). Ultimately, the trial court ruled a redacted version of the Agreement would be admitted into evidence as Exhibit 24A. Mendiburu argues this ruling was error because (1) it was irrelevant, (2) it was inadmissible under Evidence Code section 1101 and its admission violated an earlier in limine ruling excluding evidence of Mendiburu's "prior bad acts," (3) it was inadmissible under Evidence Code section 1152, and (4) it was error to rely on Evidence Code section 356 to admit the entire document.

*Background*

The Agreement

In January 2010, Mendiburu and his sisters signed the Agreement, which had an effective date of September 1, 2009, and contained certain recitals, including that in

13

October 2009 the sisters learned Mendiburu had misappropriated approximately $85,000, and that in October 2009 Mendiburu resigned as an administrator of the estate and also from his position as an officer and director of FMC, the corporate entity that owned and operated the Ranch. As part of the agreement, the parties agreed to treat the amounts misappropriated (as well as the salary he was paid between April and October 2009) as a "Loan" from FMC to Mendiburu, and agreed Mendiburu would be hired as an at-will employee of FMC. The prosecution subsequently sought, and obtained, leave to introduce a redacted version of the Agreement.

The Prior in Limine Motion

Prior to trial, Mendiburu moved in limine to exclude the sisters from referring to their beliefs that Mendiburu engaged in the use of controlled substances, had a gambling problem, or diverted other funds from the Ranch for his personal use. The People argued that, although Mendiburu's prior bad acts were inadmissible to show his propensity to steal from the Ranch, Mendiburu's prior bad acts were admissible because his use of controlled substances and/or gambling problem was relevant to his motive to steal from FMC and his prior misappropriations showed a common scheme or plan to feed his gambling and drug habits using corporate money. After an extended discussion, during which the court expressed concern over how the prosecution could lay an adequate foundation for the evidence proving Mendiburu's alleged gambling habits and alleged prior thefts, the court granted the motion to preclude evidence of Mendiburu's prior bad acts, but cautioned it could "revisit this later" if the prosecution sought to put on such

14

evidence "because I'm still a little unclear about how it would come in . . . so we may revisit that if and when the time comes to do that."

Objections to and Admission of Exhibit 24A

During Danielle's testimony about the sisters' concerns over Mendiburu's administration of the Ranch and the changes in Mendiburu's powers and responsibilities with the Ranch in November 2009, the People showed Exhibit 24 to Danielle and asked if a paragraph of that document addressed Mendiburu's position with the Ranch starting November 1, 2009. Mendiburu interposed a hearsay objection to the contents of the document, and the People initially argued it was admissible under the business records exception. The court observed that, because Mendiburu signed the document, it could be admissible under the admissions exception to the hearsay rule, and Mendiburu stated that it "[a]rguably . . . might be" but that it was still inadmissible under Evidence Code sections 1152 and 1154. The court overruled that objection, but invited other argument on the admissions exception. The prosecutor clarified that it was seeking admission of the exhibit for the purpose of showing Mendiburu agreed to his position with FMC (as well as the accompanying salary and benefits) and "not . . . for the entire document," and the defense stated it would not object to a redacted version of the document if that was the sole purpose for its admission. However, after additional discussion on whether only certain portions of the Agreement would be admitted, the court determined under Evidence Code section 356 it was necessary that the entirety of the agreement be admitted, and it was admissible under the party admissions exception to the hearsay rule.

15

Although the court allowed the prosecutor to continue using the entirety of the Agreement in his subsequent questioning of Danielle as a result of that ruling, the document was subsequently redacted in reaction to the parties' subsequent discussion about admitting the Agreement into evidence. At that time, the defense resurrected its objection under Evidence Code section 1101 to those recitals in the document that described the fact and amount of Mendiburu's prior misappropriations, arguing it was inadmissible as "prior bad acts." The prosecution asserted the clauses, by describing that the sisters had stripped Mendiburu of authority over Ranch property because of his prior misappropriations, was relevant to preempt any claim by Mendiburu that he might have believed he had a right to dispose of Ranch property, and the probative value of that evidence outweighed any prejudicial impact of such evidence. The court agreed and, after redacting references to the amount of Mendiburu's prior misappropriation to create Exhibit 24A, permitted the prosecution to introduce that exhibit.

*Analysis*

The Relevance Claim

Mendiburu first argues admission of Exhibit 24A was error because it was irrelevant. However, Mendiburu cites nothing suggesting he raised that objection below, and he cannot obtain reversal on that ground. (*People v. Visciotti* (1992) 2 Cal.4th 1, 51-52.) Moreover, even were it preserved, the evidence was relevant. Evidence is relevant when it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code § 210.) The test is whether or not the evidence tends logically, naturally, and by reasonable inference to establish any

16

fact material for the prosecution, or to overcome any material matter sought to be proved by the defense. (*People v. Freeman* (1994) 8 Cal.4th 450, 491.) The document provided support for the sisters' testimony that Mendiburu in fact did not have authority to sell the cattle, and could provide factual support that preempted a claim Mendiburu believed he was entitled to convert the cattle to his personal benefit. We conclude the evidence was relevant.

The Evidence Code Section 1101 Claim

Mendiburu primarily asserts the court abused its discretion when it concluded the evidence was not inadmissible under Evidence Code section 1101, subdivision (a). That provision generally prohibits the admission of a prior criminal act against a criminal defendant when it is "offered to prove his or her conduct on a specified occasion." However, subdivision (b) of the statute provides that such evidence is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) "Moreover, to be admissible, such evidence ' " 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' " ' [(*People v. Lewis* (2001) 25 Cal.4th 610, 637; [citation].)] Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. [Citations.] [¶] We review for abuse of discretion a trial court's

17

rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." (*People v. Cole* (2004) 33 Cal.4th 1158, 1194-1195.)

Mendiburu asserts Exhibit 24A was barred because it referenced his prior misappropriations. However, the prosecutor explained it was offered for the nonprohibited purposes of showing he understood and agreed to substantial limitations on his powers (and on his salary and benefits), and to show he was aware of those limitations, therefore undermining any "claim of right" defense. These facts, in addition to being relevant to buttressing the credibility of the sisters' testimony (and to obviating any claim the sisters were merely acting vindictively toward Mendiburu in testifying he improperly converted estate property), provided evidence relevant to Mendiburu's "knowledge" and/or "absence of mistake" as to his ability to sell the cattle and convert the proceeds. (Cf. *People v. Tufunga* (1999) 21 Cal.4th 935, 945-948 [good faith claim of right to title or ownership of specific property taken can negate the element of felonious taking necessary to establish theft].)

Because the evidence was admissible under Evidence Code section 1101, subdivision (b), for these nonprohibited purposes, the issue is whether the court abused its discretion when it concluded the probative value of the evidence for those nonprohibited purposes was outweighed by its prejudicial impact. Mendiburu does not argue on appeal why or how the admission was an abuse of the trial court's discretion under Evidence Code section 352, but instead asserts the trial court never engaged in the weighing process envisioned by that section. However, as long as the record as a whole supports the inference that the court understood and performed its obligations, "[a] trial

18

court ' "need not expressly weigh prejudice against probative value—or even expressly state that [it] has done so . . . ." ' [Quoting *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 178.) Here, the prosecutor expressly argued why the probative value of Exhibit 24A outweighed its prejudicial impact, and the defense interposed its argument on that issue, after which the judge ruled the exhibit would be admitted. Nothing further was required. (*Mendoza,* at p. 178.)

The Evidence Code Section 1152 Claim

Mendiburu argues admission of Exhibit 24A was barred by Evidence Code section 1152, subdivision (a), which provides:

> "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."

However, Evidence Code section 1152 ordinarily has no application in criminal cases. (*People v. Muniz* (1989) 213 Cal.App.3d 1508, 1515.) Moreover, even were the statute applicable, "evidence of efforts to compromise are not admissible [citation] *except to the extent that they contain admissions against interest or evidence otherwise admissible*." (*Store of Happiness v. Carmona & Allen* (1957) 152 Cal.App.2d 266, 273, italics added.) As previously explained, Exhibit 24A was not admitted for the purposes barred by Evidence Code section 1152 (i.e. to prove Mendiburu was liable for his prior misappropriations) but instead contained evidence admissible on other issues (i.e., his actual authority over Ranch property and whether he subjectively understood those

19

limitations).  Accordingly, Evidence Code section 1152 did not bar admission of Exhibit 24A.

B. Exhibit 26

Mendiburu next argues a letter written by Nicole to Mendiburu in May 2010, introduced as Exhibit 26, was improperly admitted.  He objected at trial to admission of Exhibit 26 on the grounds it contained implied references to prior bad acts in violation of Evidence Code section 1101, and its prejudicial impact outweighed any probative value under Evidence Code section 352, and argues on appeal the court's ruling admitting Exhibit 26 was an abuse of discretion.[7]

*Background*

Nicole testified that, at the meeting in May when they fired Mendiburu after confronting him about his diversion of the proceeds he gambled away, the sisters also told Mendiburu about an offer to buy the Ranch and discussed the division of the proceeds.  Although Mendiburu initially refused to consider the offer, he later indicated a willingness to consider it.  Nicole testified she "was hoping that he would take it, leave the ranch, take the offer, and go get help."  The prosecutor then showed Nicole a letter she wrote to Mendiburu the following day, ultimately introduced as Exhibit 26, that included (on the first page) a discussion that the sisters would "allow you to take your truck with you (we need to transfer truck from [Ranch] to you ASAP)."  Nicole was

---

[7]      Mendiburu also argues Exhibit 26 was hearsay.  However, he did not object at trial on that ground, and that claim of error is therefore waived.  (*People v. Wheeler* (1992) 4 Cal.4th 284, 300 ["defendant waived any hearsay claim by making no trial objection on that specific ground"].)

20

asked to which truck they were referring, and she explained it was a Ford flatbed truck, not the Toyota truck. She stated she was hopeful that, by selling the ranch and giving him the Ford truck, it would "solve this big mess," and she twice stated she hoped this solution would allow him to "go get help." She also later stated she delayed meeting with the sheriff's department for a month after the meeting because "I wanted him to go get help. I didn't want to turn him in." Nicole's direct testimony contained no express references to either Mendiburu's alleged substance abuse problems or the sisters' belief that he had a gambling problem.

On cross-examination, the defense questioned Nicole about the offer in the letter to let him keep the truck, and she responded the offer was "contingent upon him leaving the ranch, accepting the offer, and hopefully going into rehab," but defense counsel then asked "[t]hat was not stated in the letter, though, was it?" She responded that she had "talked to him about rehab in that [letter] [s]o, yes, that whole context of him taking the flatbed was about him getting help and taking the offer." Defense counsel again sought confirmation from Nicole that the language she used in the letter regarding him keeping the truck did not specify it was "contingent on accepting the offer," and she answered "[t]hat sentence was not but if you take in the whole letter, you'll see how I'm talking about . . . get[ting] a fresh start, go to rehab, help yourself, leave the ranch . . . . You have a vehicle to leave the ranch and go get help for yourself."

During the discussion about admitting the exhibits, defense counsel had no objection to the first page of the letter being admitted. However, the defense objected to the second page because, even though there was "some limited testimony about" the

21

second page, the defense argued it was "unduly prejudicial."  The prosecutor responded that the defense had "on cross elicited testimony" about the portion of the letter on page two in which Nicole stated she hoped Mendiburu would "check yourself into a good 90 day rehab to help yourself . . . [¶] . . . and get healthy," and therefore the entire letter should be admitted.  The defense responded that, although Nicole's wish that Mendiburu enter "rehab" was in evidence, the fact the letter referred to a "90 day" rehab and "checking yourself in and getting healthy" was unduly prejudicial and its admission would conflict with the court's in limine ruling barring evidence of Mendiburu's prior bad acts.  The court ruled it was not unduly prejudicial under Evidence Code section 352 to admit the entire letter and ruled the entire letter would be admitted.

*Analysis*

Mendiburu argues on appeal the court's ruling admitting the second page of Exhibit 26 was an abuse of discretion.  He suggests the letter, by referring to Nicole's wish that Mendiburu "check yourself into a good 90 day rehab . . . and get healthy," violated Evidence Code section 1101, subdivision (a)'s proscription against the introduction of evidence of Mendiburu's "character or a trait of his . . . character . . . to prove his . . . conduct on a specified occasion," and its prejudicial impact outweighed its probative value.  However, the letter was probative on whether the sisters were acting vindictively toward Mendiburu or whether they were instead concerned for his welfare, which was relevant to their credibility.  Additionally, because the defense's questions to Nicole about the letter sought to prove Mendiburu was permitted to take a truck from the Ranch without conditions, while Nicole testified the entirety of the letter showed

22

Mendiburu was permitted to take a truck from the Ranch as part of the overall effort to sell the Ranch and move forward, the entirety of the letter was proper matter for the jury to consider. (Cf. Evid. Code, § 356.)

We are unconvinced by Mendiburu's claim that the trial court abused its discretion in concluding the letter's prejudicial impact did not outweigh its probative value. Although the letter twice referred to the sisters' hope Mendiburu would check into "rehab," that was not evidence of which the jury was unaware, nor did it inform the jury (as argued by Mendiburu on appeal) that his gambling problem (information already in evidence) was accompanied by a drug abuse problem. Under these circumstances, it was not an abuse of the trial court's discretion to admit the entirety of Exhibit 26.

C. Exhibit 22

Mendiburu asserts the court erred in permitting the introduction of a set of documents, obtained from the DMV, which showed how registered title to the Toyota truck was transferred to Mendiburu, as Exhibit 22. The fourth page is a completed form titled "Affidavit for Transfer without Probate" (the Affidavit), in which Mendiburu averred under penalty of perjury that he was the "sole person" who succeeded to Father's property.[8] At trial, the defense specified it was not objecting to the foundation for the document, but was instead objecting that it was hearsay that did not qualify for admission under Evidence Code section 1280 because there was no foundational showing the

---

8    At trial, Danielle identified the writing on the Affidavit as Mendiburu's handwriting and the signature on the Affidavit, made under penalty of perjury, as Mendiburu's signature.

23

contents of the Affidavit qualified as an official record (within the meaning of Evid. Code, § 1280) as a writing made "by and within the scope of a duty by a public employee." The court admitted the document because the disputed Affidavit was admissible "under the operative act doctrine."

Legal Framework

The court in *In re Shannon C.* (1986) 179 Cal.App.3d 334, 341-342, explained the different focuses of Evidence Code sections 1530 and 1280:

> "Section 1530 is found in chapter 2 of division 11 of the Evidence Code concerned with 'Secondary Evidence of Writings.' Section 1530 codifies an exception (for public records) to the best evidence rule, which ordinarily requires that an original writing be admitted to prove the content of a writing (§ 1500). [¶] 'Section 1530 of the Evidence Code is concerned with the use of a copy of a writing in official custody to prove the content of the original.' [Citation.] Section 1530 does not allow either the original or the copy of the writing to be used to prove the truth of the matter asserted in the content of the writing. 'It is to be noted that [Evidence Code sections 1530 and 1452 through 1453] provide the means of authenticating the existence and content of an original writing in the custody of a public entity and of authenticating the copy proffered in evidence as a true copy of the original. *The admissibility of the original writing in possession of the public entity must be based on some exception to the hearsay rule such as the admission of a party* [(*Evidence Code section 1220*)] *or the exception for entries in official or public records* [(*Evidence Code section 1280*)].' [Quoting 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 5.1, p. 250, italics added by *Shannon* court.]"

The interplay between Evidence Code section 1530 and the hearsay rules provides a two-step process for admitting documents held by entities like the DMV. Evidence Code section 1530 merely specifies the methodology for establishing the foundation *for admitting a copy of what is in the public records*, thereby satisfying the first step of

24

allowing a copy to be admitted, but Evidence Code section 1530 does not speak to the second step of the analysis, which is whether the *content* of that writing is admissible to prove the truth of the matters asserted in that writing. That second step requires either that the *content* be admissible hearsay (by qualifying for admission under some *exception* to the hearsay rule) or because it is being admitted for a *non-hearsay* purpose. (See, e.g., *People v. Harvey* (1991) 233 Cal.App.3d 1206, 1220 ["hearsay is a two-pronged inquiry. In order to constitute hearsay, a statement must be received as proof of the truth of the matter stated. If the statement is received as proof of something other than the truth of the statement itself, it is not hearsay."].)

*Analysis*

The court correctly ruled the Affidavit was admissible. Mendiburu expressly stated below that he was not challenging the first step—whether Evidence Code section 1530's methodology for establishing the foundation for admitting the *copy* of what was in the public records had been satisfied. Instead, Mendiburu argued below there was no showing any *exception to the hearsay rule had been satisfied*, and therefore the Affidavit was inadmissible to prove the truth of the content of the Affidavit. However, the court correctly noted the Affidavit was not introduced to prove the truth of its contents (i.e. that Mendiburu was the "[s]ole person . . . who succeeded to the property of the decedent,") but was admissible under the operative acts doctrine. This ruling was correct:

> "Documents not offered for the truth of the matter asserted are, by definition, not hearsay. Hearsay is defined . . . as 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' Where ' "the very fact in controversy is whether certain things were

25

said or done and not . . . whether these things were true or false, . . . in these cases the words or acts are admissible not as hearsay[,] but as original evidence." ' [(Quoting 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 31, p. 714.)] For example, documents containing operative facts, such as the words forming an agreement, are not hearsay. [Citations.] The operative facts rule also applies in an action for fraud. [(Citing 1 Witkin, *supra,* Hearsay, § 33, p. 715 ['In an action for . . . deceit, the words spoken, written, or printed may be proved']; [citation].)]" (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316.)

Mendiburu was charged with perjury under section 118, which required proof of a willful statement, under oath, of any material matter that the witness knows to be false. Exhibit 22 comprised the "certifi[fication] under penalty of perjury" (§ 118, subd. (a)), which allegedly violated the statute, and therefore its admission was permitted under the operative acts doctrine.[9]

D. The Sisters' Testimony

Mendiburu argues the prosecution violated the in limine ruling, which had provisionally precluded testimony about his alleged drug abuse, alleged gambling problem, and his prior thefts, by eliciting testimony peripherally adverting to those subjects. The trial court's ruling, although granting the motion to preclude evidence of Mendiburu's prior bad acts, was subject to the proviso that the court could "revisit this later" if the prosecution sought to put on such evidence, because the court was "still a

---

[9]    In his reply brief, Mendiburu asserts the operative acts doctrine did not apply because, although Danielle testified the writing on the form was his, there was no evidence he checked the box on the form containing the false statement. However, he cites no authority suggesting that the Affidavit would or would not qualify for admission into evidence under the operative acts doctrine depending on whether he signed that document before or after the box was checked.

little unclear about how it would come in . . . so we may revisit that if and when the time comes to do that."

In two of the passages Mendiburu asserts violated the ruling, however, the court *sustained* objections (and ordered stricken) two statements by Danielle that were not responsive to the prosecutor's questions.[10] In many of the other passages Mendiburu complains violated the ruling, the testimonial references were so oblique that they drew no objection from the defense, which forfeits any claim of error. (*People v. Hinton* (2006) 37 Cal.4th 839, 893.)

IV

THE ALLEGED INSTRUCTIONAL ERRORS

Mendiburu next asserts the trial court was sua sponte required to give (1) a unanimity instruction regarding count 1, and (2) a mistake of fact and/or mistake of law instruction.[11]

---

[10] In one statement, the prosecutor asked about the May conversation between the sisters and Mendiburu about the theft of the cattle, and Danielle began her response by first stating the sisters wanted to make sure nothing was being taken and had hired a private investigator, but her description of the background was cut off when the court sustained the defense objection and ordered the testimony stricken. Shortly thereafter, and again in response to the prosecutor's question about what Mendiburu said in that meeting, Danielle said the sisters referenced the fact that they believed he had a gambling problem, the court again sustained the defense objection and ordered the testimony stricken.

[11] Mendiburu also contends the trial court erred by not giving CALCRIM 1806, which instructs that, if a defendant charged with embezzlement has a good faith belief he acted with authorization, he is not guilty of the crime. However, that instruction was given.

A. The Unanimity Claim

"In a criminal case, a jury verdict must be unanimous.  [Citations.] . . .
Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime.
[Citation.]  Therefore, cases have long held that when the evidence suggests more than
one discrete crime, either the prosecution must elect among the crimes or the court must
require the jury to agree on the same criminal act."  (*People v. Russo* (2001) 25 Cal.4th
1124, 1132 (*Russo*).)  The requirement of unanimity as to the criminal act "is intended to
eliminate the danger that the defendant will be convicted even though there is no single
offense which all the jurors agree the defendant committed."  (*People v. Sutherland*
(1993) 17 Cal.App.4th 602, 612.)  A court must give a unanimity instruction " 'when
conviction on a single count could be based on two or more discrete criminal events,' but
not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete
criminal event.' "  (*Russo,* at p. 1135.)  The court sua sponte must give the unanimity
instruction "where the evidence adduced at trial shows more than one act was committed
which could constitute the charged offense, and the prosecutor has not relied on any
single such act."  (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 274-275.)

Here, Mendiburu was charged in count 1 with "theft of personal property."
However,  the evidence showed three potential criminal actions, separate in time and
place and manner, and the People do not contest on appeal that any one of these acts
would have supported the jury's conviction for stealing personal property as alleged in
count 1.  Those distinct acts were Mendiburu's unauthorized taking of the cattle from the
Ranch in Inyo County sometime around mid-November 2009, his conversion of the

28

check to his own benefit a few weeks later in Nevada, and his transferring title to the Toyota truck to his own name in May 2009 in California. Accordingly, a unanimity instruction was required sua sponte unless the prosecution elected only one of those acts as the basis for the charge. (*Russo, supra,* 25 Cal.4th at p. 1132.)

The record does not show the prosecutor clearly elected which criminal act formed the basis for count 1. During closing argument, the prosecutor argued "[y]ou have got three thefts: theft of a truck, theft of the cattle, and theft of property . . . . [¶] [Y]ou can find theft under two different theories. You can find [Mendiburu] made a theft by larceny or by embezzlement." When discussing the "larceny form" of theft, the prosecutor noted one element was that Mendiburu moved the stolen property "even a small distance and kept it for any time . . . however brief. Now, that's with regard to Count 1. Well, actually, all the counts alleging theft." This argument provided no clear election suggesting the prosecution was eschewing theft of the truck as the basis for convicting Mendiburu on count 1. Moreover, the prosecutor also stated "with regard to Count 1, which alleges theft [of] property from [the Ranch], you can look at it one of two ways. That property could have been the cows or it could have been the money . . . . You have to parse that out." This argument again provided no clear election suggesting the prosecution was electing which taking provided the basis for convicting Mendiburu on count 1.

Under these circumstances, where the evidence showed three potential criminal acts (separated by time, place and manner) that could have formed the basis for the theft alleged in count 1, it was error not to give a unanimity instruction. Moreover, the People

have made no effort on appeal to rebut Mendiburu's argument that the error was reversible error under *Russo* because some jurors could have found Mendiburu guilty on count 1 for one criminal act while others convicted him on count 1 for distinct acts. (See, e.g., *People v. Thompson* (1995) 36 Cal.App.4th 843, 852-853 [failure to give a unanimity instruction governed by harmless error standard under *Chapman*, and where different acts by defendant diverting funds could have served as basis for theft conviction, failure to give unanimity instruction is reversible error].) We reverse the conviction on count 1.

   B. The Mistake of Fact or Law Claim

   Mendiburu argues the court sua sponte should have instructed the jury on mistake of fact because there was substantial evidence to support the defense and it was not inconsistent with his theory of the case. He asserts that because Exhibit 24A recharacterized monies he had misappropriated prior to September 2009 as a "loan," and included a promissory note committing Mendiburu to repay the estate for those funds, there was evidence he mistakenly but in good faith believed he could take additional estate assets that would merely be added to the principal amount of the loan, and therefore the specific intent to deprive the estate of the assets was absent. However, the court in *People v. Lawson* (2013) 215 Cal.App.4th 108 (*Lawson*) applied our Supreme Court's analogous decision in *People v. Anderson* (2011) 51 Cal.4th 989, which held a trial court has no sua sponte obligation to instruct on "accident" as negating the specific intent element of an offense, to conclude a court likewise has no sua sponte obligation to instruct on "mistake of fact" as negating a specific intent to steal. The *Lawson* court

30

observed that "as explained in *Anderson,* the trial court's sua sponte instructional duties *do not apply to defenses that serve only to negate the mental state element of the charged offense* when the jury is properly instructed on the mental state element, *even when substantial evidence supports the defense and it is consistent with the defendant's theory of the case.* [Citation.] In these circumstances, the court's duty to [instruct] 'extend[s] no further than to provide an appropriate pinpoint instruction *upon request by the defense*.' " (*Lawson, supra*, 215 Cal.App.4th at p. 119, italics added.) We agree with *Lawson's* application of *Anderson* and conclude that a "mistake of fact" instruction, although potentially available when there is evidence to support it *and* the defense requests it, is not sua sponte required when the jury has already received proper instructions on the mental state element required for the offense.

Mendiburu argues the court sua sponte should have also (or perhaps alternatively) instructed the jury on "mistake of law" based on the same factual basis in the record. It is oft stated that mistakes as to the law are " 'almost never a defense.' [Citation.] There are rare instances where ignorance that a penal law prohibits one's conduct *does* provide a defense. Those instances include crimes punishing the failure to act (rather than an affirmative act) and certain conspiracies." (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1663.) Mendiburu cites nothing to suggest a "mistake of law" defense is even *available* to any of the charged offenses, much less that mistake of law is a "general principle[] of law that [is] commonly or closely and openly connected to the facts before the court and that [is] necessary for the jury's understanding of the case" that it gave rise here to a sua sponte instructional obligation. (*People v. Montoya* (1994) 7 Cal.4th 1027,

31

1047.) Of course, to the extent Mendiburu's argument for a "mistake of law" instruction is merely a relabeling of his "mistake of fact" claim (see *Meneses,* at p. 1662 [the "distinction between mistakes of fact and mistakes of law is an 'often difficult distinction' "]), we reject his argument for the reasons outlined in *Lawson, supra*, 215 Cal.App.4th 108.

VI

THE SUBSTITUTE JUDGE CLAIMS

Mendiburu argues he was entitled to have the same judge who presided at trial (Judge White) also rule on his new trial motion, and because the substituted judge who actually ruled on his new trial motion did not have the familiarity with the witnesses necessary to conduct an independent reweighing of the evidence, the order denying his new trial motion was error. Mendiburu also argues he was entitled to have Judge White determine his sentence, and the matter requires remand for resentencing before Judge White.

A. Background

The jury returned its guilty verdicts on August 15, 2013, and Judge White scheduled sentencing for October 22, 2013. Due to circumstances beyond Mendiburu's control, on September 6, 2013, the court was required to relieve Mendiburu's trial attorney as his defense counsel. The court, cognizant of the pending sentencing date and the need to hear any new trial motions before sentencing, set a hearing for the next court day (September 9, 2013) to appoint new counsel. At the next hearing, Mendiburu expressed a wish to hire private counsel, and new counsel appeared for Mendiburu at a

September 18, 2013, hearing at which Mendiburu asked to continue the sentencing hearing until December 2013 to provide new counsel adequate time to prepare a new trial motion. At the subsequent status conference on October 2, 2013, at which time new counsel for the People also appeared, the court granted Mendiburu a continuance of sentencing until January 24, 2014, and indicated that, although the court would request that Judge White be assigned to preside over that hearing, his availability was subject to the discretion of the California Judicial Council.

At the January 24, 2014, hearing, the court heard Mendiburu's motion, filed in mid-December 2013, seeking to continue the sentencing hearing on the grounds defense counsel had been unable to timely obtain reporter's transcripts of the trial. The People, although not opposing a continuance, asked to set sentencing as soon as feasible because Mendiburu remained at liberty during this period of delay. The court informed the parties that Judge White, a retired judge who resided in Palm Desert, California, but sat by assignment on Mendiburu's trial, was "fully booked" until May 2014 and, moreover, it was not economically feasible for him to return to Inyo County for a single matter. The court found that, despite good faith efforts to secure him to preside over the posttrial motions and sentencing, Judge White was unavailable in the near term and was reluctant to serve on this single matter. Accordingly, the court as presiding judge ruled it would exercise its power under Government Code section 69508 to assign itself to preside over all further matters.

33

B. <u>Legal Framework</u>

The statutory scheme provides that, "If after the commencement of the trial of a criminal action or proceeding in any court the judge or justice presiding at the trial shall die, become ill, or *for any other reason be unable to proceed with the trial,* any other judge or justice of the court in which the trial is proceeding may proceed with and finish the trial . . . .  The judge or justice authorized by this section to proceed with and complete the trial shall have the same power, authority, and jurisdiction as if the trial had been commenced before that judge or justice "  (§ 1053, italics added.)  Although it is preferable for the judge who presided at the trial to hear the motion for a new trial (*People v. Norton* (1956) 141 Cal.App.2d 790, 792), as well as to preside at the sentencing hearing (*People v. Jacobs* (2007) 156 Cal.App.4th 728, 738), there is no constitutional right (*People v. Moreda* (2004) 118 Cal.App.4th 507, 512-518 (*Moreda*)) or statutory right (*People v. Norton, supra*) to have the same judge preside over those phases of the trial.  Instead, there is no error when the trial judge is unavailable and a different judge acts on the new trial motion (*ibid.*) or imposes sentence on the defendant after a trial.  (*People v. Downer* (1962) 57 Cal.2d 800, 816; *People v. Cole* (1960) 177 Cal.App.2d 458, 460.)  We also note that Judge White, who presided at trial, is a retired judge who does not reside in the County in which the trial took place, and he declined the invitation to return to the trial location to entertain the new trial motion and conduct the sentencing hearing.  Under these circumstances the superior court has no authority to require Judge White to conduct further proceedings in this case.

34

C. <u>Analysis</u>

*The New Trial Motion Claim*

Mendiburu argues it was error to have the new trial motion ruled on by anyone other than Judge White because, quoting from *Moreda, supra*, 118 Cal.App.4th at page 514, "[c]ertainly, a judge's first-hand observations of the demeanor of a witness could be useful when ruling on a motion for new trial." Essentially, Mendiburu argues a substituted judge is incapable of conducting the assessment of the evidence required when considering a new trial motion. Mendiburu's argument ignores that, immediately following that quoted passage, the *Moreda* court then said at pages 514 to 515:

> "However, since the court functions in a supervisory capacity and its review must be limited to what the evidence shows, we believe that, at least in most cases, a court can effectively rule on a motion for new trial by reviewing the transcripts of the proceedings and thereby determining whether the jury's verdict, and the weight of evidence and credibility determinations upon which that verdict rests, are supported by the evidence. Thus, we disagree that section 1181 implicitly confers on criminal defendants the right to demand or expect that the judge who presided at trial also rule on his or her post-trial challenge to the sufficiency of the evidence."

Here, the presiding judge, after exercising his power under Government Code section 69508 to assign himself to hear Mendiburu's new trial motion and sentencing, explicitly scheduled the hearing almost 60 days later "not only for the defense to prepare a significant motion" but also because the court recognized it would "need an opportunity to review the—at least the relevant portions of the trial transcript for purposes of both informing me with respect to the merits of any motion for a new trial and for sentencing." Thus, the court recognized that its role under *Moreda* contemplated a complete

35

familiarization with the record to make the appropriate determinations in connection with Mendiburu's new trial motion, and Mendiburu does not provide any basis for assuming the court did not fully comply with its obligations in connection with, or applied inappropriate standards when ruling on, the new trial motion. We agree with *Moreda's* assessment that the analogous decision by our Supreme Court in *People v. Espinoza* (1992) 3 Cal.4th 806 is fatal to Mendiburu's claim that he was deprived of a full consideration of his new trial motion by the change of judges. As *Moreda* observed:

> "*Espinoza* was a murder case in which the court affirmed a death judgment. The court held, among other things, that the defendant's rights were not violated by the fact that a motion to modify the death verdict was adjudicated by a judge who did not hear the entire guilt phase trial. [Citation.] The judge who presided when the guilt phase commenced became too ill to continue and a different judge was appointed pursuant to section 1053. The defendant objected to the midtrial substitution on several grounds including that the second judge could not properly rule on the motion to modify the jury's death verdict. [Citation.] The defendant expressly argued that, because the second judge did not personally hear the testimony of a crucial material witness, he could not possibly evaluate the witness's credibility and thus 'could not fully exercise his independent judgment of the evidence' for purposes of ruling on the motion. [Citation.] The *Espinoza* court disagreed. It acknowledged that, when ruling on a motion to modify a death judgment, the trial court conducts an independent review of the evidence; the judge must ' "assess the credibility of the witnesses, determine the probative force of the testimony, and weigh the evidence." ' Notwithstanding this procedure, the *Espinoza* court rejected the defendant's contention that 'the requisite assessment can be made only by a judge who has personally heard the testimony presented at the guilt phase of the trial.' [(Quoting *Espinoza, supra,* at p. 830.)] The *Espinoza* court reasoned that the trial court was not to make an 'independent and de novo penalty determination.' Rather, the trial court was required to make an independent judgment as to whether the weight of the evidence supports the jury verdict. The court rejected the contention that the second judge could not fully exercise that independent judgment by reviewing the transcripts of the trial

36

proceedings that took place before his substitution. [Citation.] [¶] The postverdict review conducted by the trial court in *Espinoza* is comparable to the review that a trial court performs when ruling on a motion for new trial challenging the sufficiency of the evidence. In both contexts, the court undertakes an independent analysis, weighs the evidence, and makes credibility determinations, but does not substitute its own judgment for that of the jury. Thus, the Supreme Court's holding in *Espinoza* applies in this context. It confirms our conclusion that a judge who did not personally hear testimony at trial may nevertheless make an adequate independent assessment of the evidence in the record in order to determine whether the weight of the evidence supports the jury's verdict." (*Moreda, supra*, 118 Cal.App.4th at pp. 517-518.)

We likewise conclude a judge who did not personally hear the trial testimony may nevertheless make an adequate independent assessment of the evidence in the record to determine, in connection with a new trial motion, whether the weight of the evidence supports the jury's verdict. Mendiburu's argument of error in connection with the ruling on his motion for new trial is without merit.

*The Sentencing Claim*

We likewise conclude Mendiburu's argument of error in connection with his sentencing hearing is without merit. Mendiburu, citing *Jacobs, supra,* 156 Cal.App.4th 728 and *People v. Strunk* (1995) 31 Cal.App.4th 265, quotes *Strunk* as holding that "[a]bsent . . . good cause shown, a defendant should be able to have the trial judge who was familiar with the evidence at trial impose sentence." (*Strunk,* at pp. 275-276, fn. 13.) However, the predicate to the general preference for the same judge to preside at the sentencing hearing is whether there was "good cause shown" for a different judge to be substituted, and the court below found "good cause" to replace Judge White with the new judge. Mendiburu argues this determination was an abuse of discretion because there

was some indication Judge White might become available if sentencing was continued another four to five months, and Mendiburu was willing to travel to Palm Desert (Judge White's city of residence) to accommodate sentencing at that later date.  However, the court, after noting (1) the offenses had occurred in 2009, (2) the jury had returned its verdict in August 2013, and (3) there had already been "more than [the] usual delay between the time of trial and sentencing," concluded that "further extraordinary delay would not be in the interest of justice."  We conclude, considering the fact that Mendiburu (despite having been convicted five months earlier) remained at liberty and sought to remain so for at least another four to five months, the court's ruling that a *further* (and lengthy) delay would not be "in the interests of justice" was not an abuse of discretion, and therefore we hold the presiding judge's conclusion there was good cause shown to substitute a different judge was not an abuse of discretion.[12]

VII

THE RESTITUTION CLAIM

Mendiburu asserts he was entitled to know the amount he would be required to pay as "victim restitution" sometime before the court imposed sentence, and therefore the

---

[12]    For this reason, Mendiburu's reliance on *Jacobs, supra,* 156 Cal.App.4th 728 is inapposite.  The *Jacobs* court, after recognizing that granting a continuance to allow for the trial judge to preside at sentencing will only be reversed for an abuse of discretion (*id*. at pp. 735-736), concluded it was an abuse of discretion to deny a request for a continuance to accommodate "the recognized preferred procedure that defendant be sentenced by the trial judge [because] the trial judge was available on the following Monday, necessitating a continuance of all of two days."  (*Id*. at p. 740.)  The length of the delay alone distinguishes *Jacobs* from the instant case.

38

court improperly sentenced him prior to any hearing determining the amount of the victim restitution order. Specifically, he argues that, because one of the enumerated circumstances in mitigation that must be considered in selecting the sentence is whether "[t]he defendant made restitution to the victim" (Cal. Rules of Court, rule 4.423(b)(5)),[13] a defendant must be informed (at some undefined time *before* the court imposes sentence) of the amount he is going to be required to pay to provide him with the opportunity to pay such amount and thereby take advantage of that circumstance in mitigation.

Section 1202.4, subdivision (f), provides that a court "shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. If the amount of loss cannot be ascertained at the time of sentencing, the restitution order shall include a provision that the amount shall be determined at the direction of the court. . . ." The statutory scheme also provides that "when the economic losses of a victim cannot be ascertained at the time of sentencing pursuant to subdivision (f) of Section 1202.4, the court shall retain jurisdiction over a person subject to a restitution order for purposes of imposing or modifying restitution until such time as the losses may be determined." (§ 1202.46.) As the court stated in *People v. Bufford* (2007) 146 Cal.App.4th 966, 971, "[u]nder a reading of the plain language of section 1202.4, if the court cannot determine the amount of restitution at the time of sentencing, there is no

---

[13]    All rule references are to the California Rules of Court.

limitation upon when the court must next set a restitution hearing, nor is there a limitation on the permissible reasons that may prevent fixing the amount of restitution."

Mendiburu's argument impliedly asserts *Buford* was wrongly decided, and the statutory scheme governing restitution orders under section 1202.4 cannot be read according to the literal words of the statute, because delaying a restitution hearing to a date *after* sentencing is irreconcilable with the defendant's right to present the mitigating evidence contemplated by rule 4.423(b)(5) that he paid restitution to the victim. However, when construing a statute, our task is "to determine and give effect to the Legislature's intent. [Citations.] ' "In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. . . ." ' [Citation.] 'The words must be construed in context in light of the nature and obvious purpose of the statute where they appear.' [Citation.] The statute 'must be given a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity.' [Citation.] [¶] Potentially conflicting statutes must be harmonized whenever possible." (*Barker v. Brown & Williamson Tobacco Corp.* (2001) 88 Cal.App.4th 42, 46.)

Mendiburu's reading of the interplay between the sentencing factor under rule 4.423(b)(5) and the restitution statute is inconsistent with the apparent intent that the restitution order contemplated by section 1202.4, subdivision (f), be imposed at the time

40

of sentencing. The statutory scheme, which authorizes imposition of the victim restitution, includes the proviso that the court may defer entering that order if "the amount of loss cannot be ascertained *at the time of sentencing"* (*ibid.*), and also provides that if such losses cannot be determined "*at the time of sentencing* pursuant to subdivision (f) of Section 1202.4" the court shall retain jurisdiction to enter a later order. (§ 1202.46.) These provisions impliedly contemplate entry of the restitution order *as part of the sentencing hearing*. Mendiburu's argument, however, is that the order must be entered *well in advance of sentencing* to provide time for the defendant to marshal his resources and pay that amount so that he can then be positioned to argue (at the later sentencing hearing) that he satisfied rule 4.423(b)(5).

We disagree that rule 4.423(b)(5), impliedly requires the victim restitution hearing to be held well in advance of the sentencing hearing, and we instead harmonize the interplay between rule 4.423(b)(5), and section 1202.4, subdivision (f), by interpreting the former as permitting a defendant to argue in mitigation that he "made restitution to the victim" voluntarily rather than under the compulsion of any court-ordered restitution. Under our construction, the phrase "made restitution to the victim" as used in rule 4.423(b)(5) is not referring to conduct by a defendant acting under compulsion of a court order entered under section 1202.4, subdivision (f), but is instead referring to voluntary conduct (much like the factor in mitigation contained in rule 4.423(b)(3) ["defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process"]) by the defendant. This construction thus preserves the right of a defendant who makes restitution before sentencing to cite that fact in mitigation at sentencing (see

41

*People v. Hughes* (1980) 112 Cal.App.3d 452) without undermining the apparent intent of the statute that victim restitution orders be entered at, or when necessary after, sentencing.

## DISPOSITION

The judgment of conviction on count 1 is reversed, and in all other respects the judgment of conviction is affirmed. The matter is remanded for resentencing on the remaining convictions.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

AARON, J.